**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 13-1765**

———————

CORETEL VIRGINIA, LLC,

Plaintiff – Appellant,

v.

VERIZON VIRGINIA, LLC; VERIZON SOUTH, INC.; MCIMETRO ACCESS
TRANSMISSION SERVICES, LLC; MCI COMMUNICATIONS SERVICES,
INC.; VERIZON BUSINESS GLOBAL LLC; BELL ATLANTIC
COMMUNICATIONS, INC., d/b/a Verizon Long Distance,

Defendants – Appellees.

———————

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. Claude M. Hilton, Senior
District Judge. (1:12-cv-00741-CMH-TCB)

———————

Argued: January 30, 2014    Decided: May 13, 2014

———————

Before WILKINSON, NIEMEYER, and DUNCAN, Circuit Judges.

———————

Affirmed in part, reversed in part, and remanded with
instructions by published opinion. Judge Duncan wrote the
opinion, in which Judge Wilkinson joined. Judge Niemeyer wrote
an opinion concurring in part and dissenting in part.

———————

**ARGUED:** Edward Jay Tolchin, OFFIT KURMAN, P.C., Tysons Corner,
Virginia, for Appellant. Scott H. Angstreich, KELLOGG, HUBER,
HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for
Appellees. **ON BRIEF:** Andrew M. Hetherington, KELLOGG, HUBER,

HANSEN, TODD, EVANS & FIGEL, P.L.L.C., Washington, D.C., for Appellees.

———————————

DUNCAN, Circuit Judge:

Two telecommunications carriers, CoreTel Virginia, LLC and Verizon Virginia, LLC, dispute their respective responsibilities under their interconnection agreement ("ICA"), a contract which governs how the carriers connect their networks and exchange data. Each party contends that the other improperly billed it for various services. The district court granted summary judgment in Verizon's favor on each claim. For the reasons that follow, we vacate the district court's decision with respect to Verizon's facilities claims, but affirm as to the others.

Ironically, in pursuit of its preferred result, the dissent does exactly what it accuses the majority of doing. As we explain in greater detail below, the dissent interprets the ICA as the dissent imagines it should have been written, and not as it was. With no textual support, and in contravention of the cardinal rule that a contract must be interpreted as a whole, giving effect to all its terms, the dissent elevates § 11 to an isolated and independent status, renders superfluous the only provision that specifically deals with interconnection, and altogether ignores § 2.1, which explicitly provides that headings are to have no substantive effect on the agreement's meaning.

3

The CoreTel/Verizon ICA[1] at issue here is a private contract that implements duties imposed by the Telecommunications Act of 1996, Pub. L. 104–104, 110 Stat. 56, codified at 47 U.S.C. § 151 et seq. We therefore begin with a brief discussion of the relevant provisions of the Telecommunications Act and the key provisions of the parties' ICA before turning to the procedural history before us.

A.

The Telecommunications Act seeks to foster competition in the telecommunications market by reducing the competitive advantages enjoyed by the telecommunications carriers, known as "incumbent carriers," that enjoyed a monopoly in the market at the time the statute was enacted. The Act requires incumbent carriers to share their physical networks with new market entrants, known as "competing carriers," to mitigate the prohibitive cost of building a new network. This appeal implicates two of the duties imposed on incumbent carriers under 47 U.S.C. § 251.

First, § 251(c)(3) allows a competing carrier to lease components of an incumbent carrier's physical network for any

---

[1] There are actually two Verizon/CoreTel ICAs. Because they are identical in every term relevant here, we will treat them as a single ICA.

purpose if an incumbent's failure to provide these elements would impair the competing carrier's ability to provide services. 47 U.S.C. §§ 251(c)(3), 251(d)(2)(B). An incumbent carrier must provide these network elements at cost-based rates, known as "TELRIC," as opposed to higher tariff rates.[2] 47 U.S.C. §§ 251(c)(3), 252(d)(1); 47 C.F.R. § 51.505(b) (2010); see also Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 ["Local Competition Order"], 11 F.C.C. 15499, ¶ 29 (1996). These network elements also must be "unbundled," meaning that they must be offered individually, and not only as part of a broader package of services. 47 U.S.C. § 251(c)(3); Talk Am., Inc. v. Mich. Bell Tel. Co., 131 S. Ct. 2254, 2258 (2011); Local Competition Order, 11 F.C.C. 15499, ¶ 27.

Second, § 251(c)(2) promotes interconnection, the physical link between two telecommunications networks that allows each carrier's customers to call the other's. The FCC has interpreted § 251(c)(2) to require, among other things, that an incumbent carrier lease a competing carrier "entrance

---

[2] Carriers generally may only charge rates under tariffs filed with state and federal regulatory agencies but, in certain cases the Telecommunications Act requires a carrier to charge an even lower, TELRIC rate. See Verizon Commc'ns, Inc. v. FCC., 535 U.S. 467, 478, 489 (2002); AT&T Commc'ns of Va., Inc. v. Bell Atl.-Va., Inc., 197 F.3d 663, 674 (4th Cir. 1999).

facilities" required for interconnection at TELRIC.[3]    See
Unbundled Access to Network Elements ["Remand Order"], 20 F.C.C.
2533, ¶ 140 (2005); Review of the Section 251 Unbundling
Obligations of Incumbent Local Exch. Carriers ["Triennial Review
Order"], 18 F.C.C. 16978, ¶ 366 (2003); see also Talk Am., 131
S. Ct. at 2261.

Until 2003, the FCC had also interpreted § 251(c)(3) to
require incumbent carriers to provide all entrance facilities at
TELRIC.    However, the FCC reversed course in its Triennial
Review Order and Remand Order.    It concluded that because
"entrance facilities are less costly to build, are more widely
available from alternative providers, and have greater revenue
potential," an incumbent carrier's failure to provide access to
these facilities would not impair the viability of competing
carriers.    Remand Order, 20 F.C.C. 2533, ¶ 138, 141 (2005).[4]    The

---

[3] An "entrance facility" is the physical infrastructure,
such as wires or cables, typically used to connect one network
with another ("interconnection") or to transport data to and
from equipment that a carrier has installed on another carrier's
premises ("backhauling").    Talk Am., 131 S. Ct. at 2258–59.
Backhauling "occurs when a competitive [carrier] uses an
entrance facility to transport traffic from a leased portion of
an incumbent network to the competitor's own facilities.
Backhauling does not involve the exchange of traffic between
incumbent and competitive networks."    Id. at 2259 n.2.

[4] The FCC initially concluded, in the Triennial Review
Order, that entrance facilities are not covered by § 251(c)(3)
because they are not "network elements."    18 F.C.C. 16978, ¶
366.    Competitive carriers challenged this interpretation, and
(Continued)

FCC determined, therefore, that incumbent carriers need not provide entrance facilities on an unbundled basis at TELRIC rates under § 251(c)(3). Id. at ¶ 137.

Significantly, however, the FCC did not alter incumbent carriers' duties under § 251(c)(2), the provision that specifically governs interconnection. Id. at ¶ 140. Therefore, while an incumbent carrier no longer has a general obligation to provide entrance facilities at TELRIC under § 251(c)(3), it remains obligated to provide entrance facilities at TELRIC when they are used for interconnection under § 251(c)(2). See Talk Am., 131 S. Ct. at 2264-65; Remand Order, 20 F.C.C. 1533, ¶ 140; Triennial Review Order, 18 F.C.C. 16978, ¶¶ 365, 366.

## B.

With this regulatory framework in mind, we now turn to the ICA between Verizon, an incumbent carrier, and CoreTel, a competing carrier. A close examination of the ICA is necessary because the § 251 duties discussed above are not directly enforceable. See 47 U.S.C. §§ 251(c)(1), 252(a)(1). Instead, these duties only apply if they are incorporated into an ICA. See Core Commc'ns, Inc. v. SBC Commc'ns Inc., 18 F.C.C. 7568, ¶

---

the United States Court of Appeals for the District of Columbia Circuit remanded the matter to the FCC, observing that "the Commission's reasoning appears to have little or no footing in the statutory definition." U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 586 (D.C. Cir. 2004). In response, the FCC promulgated the Remand Order. 20 F.C.C. 2533, ¶ 4.

32 (2003), <u>vacated on other grounds by</u> <u>SBC Commc'ns Inc. v. FCC</u>, 407 F.3d 1223 (D.C. Cir. 2005).

The interplay between the ICA and the relevant statutory provisions is further complicated by the fact that the Verizon/CoreTel ICA is an adoption of an existing ICA under 47 U.S.C. § 252(i). Because the original ICA took effect before the FCC reinterpreted § 251(c)(3) in its <u>Triennial Review Order</u> and <u>Remand Order</u>, the adoption agreement that accompanies the CoreTel/Verizon ICA contains a provision meant to clarify Verizon's duties in light of the changed regulatory backdrop. <u>See</u> ICA Adoption Agreement § 1.B, J.A. 366. Section 1.B of the adoption agreement provides that, "adoption of the [ICA] does not include adoption of any provision imposing an unbundling obligation on Verizon that no longer applies to Verizon under [the <u>Triennial Review Order</u> and <u>Remand Order</u>]." J.A. 366.

To aid in our analysis, we will discuss four provisions of the ICA. Section 4 addresses interconnection, § 11 addresses the leasing of network elements, § 5.7 sets out a compensation regime for local cross-network calls, and Exhibit A lists the rates that apply to the agreement. We now address each briefly in turn.

ICA § 4, "Interconnection and Physical Architecture," addresses the physical interconnection of the parties' two networks. J.A. 216. This section provides that CoreTel may

8

specify one of three physical methods to connect with Verizon at an agreed-upon interconnection point. ICA § 4.3.1, J.A. 218. One of the methods allows CoreTel to lease an entrance facility from Verizon.[5] Id. CoreTel may request any of the listed interconnection methods at the "rates and charges, set forth in this Agreement, in any applicable Tariff(s), or as may be subsequently agreed to between the parties." ICA § 4.3.3, J.A. 218. The ICA provides Verizon analogous rights to interconnect with CoreTel. ICA § 4.3.4, J.A. 218.

ICA § 11, "Unbundled Access," enumerates the network elements, including entrance facilities, that Verizon will provide to CoreTel on an unbundled basis. J.A. 240–66. This section primarily consists of a detailed list of network elements, expressed in highly technical terms, and the parameters under which they may be ordered.[6] Id.

ICA § 5.7, "Reciprocal Compensation and other Intercarrier Compensation Arrangements," provides a distinct billing regime

---

[5] The other options allow CoreTel to interconnect through "collocation"--that is, by installing its equipment inside of Verizon's facility. ICA § 4.3.1, J.A. 218. One option allows CoreTel to use its own collocated equipment, and the other allows CoreTel to use a third-party's collocated equipment. Id.

[6] ICA § 11 does not, for example, contain a listing for "entrance facilities." Instead, it lists the various, specific types of physical wires and cables that Verizon is to make available, such as "2-Wire HDSL Compatible Loop" or "4-Wire DS1-compatible Loop." ICA §§ 11.3.5, 11.3.7, J.A. 243.

for local calls originating within Verizon's network and terminating within CoreTel's network (i.e., local calls from Verizon customers to CoreTel customers), and vice versa. J.A. 222. These calls are billed per minute of usage as "reciprocal compensation" by the recipient carrier. See ICA §§ 1.60, 1.60a, 5.7.1, J.A. 212, 222-23; ICA Exhibit A §§ A.I, B.I, J.A. 322, 353.

Finally, ICA Exhibit A lists TELRIC rates for various network elements and includes rates for leasing entrance facilities under the heading "Unbundled Transport." ICA Exhibit A § A.II.C, J.A. 324. It also includes rates for reciprocal compensation. ICA Exhibit A §§ A.I, B.I, J.A. 322, 353.

### C.

Soon after the parties agreed to their ICA, a dispute arose regarding the rates CoreTel is required to pay for interconnection entrance facilities. Verizon insisted that CoreTel pay tariff rates and CoreTel refused. This dispute continued until 2012 when Verizon finally threatened to terminate CoreTel's service. CoreTel brought suit seeking to enjoin Verizon's threatened service termination. Verizon filed various counterclaims, and CoreTel amended its complaint to add still more claims. The district court ultimately divided these claims and counterclaims into four broad categories: (1) Verizon's facilities claims relating to its bills to CoreTel for

10

the entrance facilities CoreTel leased; (2) CoreTel's facilities claims relating to its bills to Verizon for the entrance facilities that CoreTel contends Verizon leased; (3) Verizon's reciprocal compensation claims; and (4) Verizon's claims that CoreTel improperly billed it for services under CoreTel's tariffs.

The district court granted summary judgment in Verizon's favor on each issue, but on liability only. It reserved the question of damages for trial. The parties then jointly moved for a final judgment reflecting "the stipulated damages that are required by [the district court's summary judgment] ruling" to expedite an appeal. Joint Motion, J.A. 1500. The district court entered the agreed-to final judgment, and this appeal followed.

## II.

Each of the issues discussed below was resolved on motions for summary judgment. Accordingly, we review each under the same familiar standard:

> We review the district court's order granting summary judgment de novo, viewing the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party. Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.

11

Garofolo v. Donald B. Heslep Assocs., Inc., 405 F.3d 194, 198-99 (4th Cir. 2005) (internal citations omitted).

While we must draw all reasonable inferences in the light most favorable to the nonmoving party, it is ultimately the nonmovant's burden to persuade us that there is indeed a dispute of material fact. Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002). It must provide more than a scintilla of evidence--and not merely conclusory allegations or speculation--upon which a jury could properly find in its favor. Id.

Like any other contract, "[w]e interpret [an ICA] as written and, when its terms are clear and unambiguous, we construe the contract according to its plain meaning." Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va., Inc., 715 F.3d 501, 517 (4th Cir. 2013) (internal quotation marks and citation omitted). Because an ICA is a private agreement on the one hand, and an instrument of federal regulation on the other, we are guided in our interpretation by both contract law and relevant federal precedent. Id. at 517 n.20. When "[t]he contractual duty at issue . . . is a duty imposed by the Act itself . . . the resolution of a claim regarding the scope of that statutory duty . . . depends on the interpretation and application of federal law." Core Commc'ns, Inc. v. Verizon Md. LLC, ___ F.3d ____, 2014 WL 868618 (4th Cir. Mar. 6, 2014).

12

III.

On appeal, CoreTel challenges the district court's grant of summary judgment in Verizon's favor on all claims. For clarity, we adopt the district court's categorization of the claims, and address each category in turn.

A.

We first address Verizon's claims relating to the applicable rates for entrance facilities. Verizon contends that § 1.B of the Adoption Agreement eliminated its obligation under the ICA to provide entrance facilities at TELRIC for any purpose. As a result, Verizon has billed CoreTel for its interconnection entrance facilities at tariff rates since the adoption of the ICA. CoreTel has refused to pay those rates, maintaining that the ICA permits it to pay the lower TELRIC rates.

We agree with the dissent that this is, ultimately, a contract dispute and, as with any contract, we interpret the ICA according to its terms. But the dissent ignores both the "cardinal principle of contract construction . . . that a document should be read to give effect to all its provisions," Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995), and the fundamental rule that, when the written terms of an agreement are clear, evidence of the parties' intent "is

13

utterly inadmissible." Moran v. Prather, 90 U.S. 492, 501 (1874).

As discussed above, ICA § 4.3 is the only provision of the ICA that deals specifically with interconnection. Within that section, § 4.3.1 authorizes CoreTel to order "an Entrance Facility . . . leased from Verizon" for interconnection. J.A. 218. ICA § 4.3.3 then provides that CoreTel may order this entrance facility at the "rates and charges, set forth in this Agreement, in any applicable Tariff(s), or as may be subsequently agreed to between the parties." Id. Exhibit A of the ICA lists, in turn, the schedule of rates for various network elements and services, including TELRIC rates for entrance facilities. ICA Exhibit A § A.II.C, J.A. 324. Though Verizon contends otherwise, the most natural reading of these provisions is that the TELRIC rates listed at Exhibit A § A.II.C. are the "rates and charges, set forth in this Agreement" referred to in ICA § 4.3.3.

Verizon advances an alternative interpretation of the ICA. ICA § 4.3, it contends, does not give rise to any independent obligation to make entrance facilities available at TELRIC but, instead, simply indicates that entrance facilities may be leased under § 11 for interconnection. In Verizon's view, § 1.B of the adoption agreement eliminates its obligation under § 11 to provide entrance facilities at TELRIC for any purpose. It

14

contends that entrance facilities are therefore unavailable at those rates under § 4.3.

Simply put, no provision of the ICA indicates that § 4.3 relies upon § 11 in the way Verizon suggests. As explained above, ICA § 4.3 imposes an obligation on Verizon, independent of § 11, to offer entrance facilities at the TELRIC rates listed in Exhibit A.[7] Therefore we need not consider the impact of § 1.B of the Adoption Agreement on the services available under § 11. Section 1.B of the Adoption Agreement does not affect our analysis of ICA § 4.3 because Verizon's duties under ICA § 4.3 arise under the specific interconnection provisions of 47 U.S.C. § 251(c)(2). These duties were unaltered by the Triennial Review Order and the Remand Order, the FCC orders incorporated by the Adoption Agreement.

We further note that our conclusion in no way renders the entrance facility provisions of ICA § 11 superfluous. ICA § 11 permitted CoreTel to purchase entrance facilities for purposes not addressed by ICA § 4.3, such as backhauling. See Talk Am., 131 S. Ct. at 2259.

---

[7] Verizon suggests that, because rates for entrance facilities are listed in Exhibit A only under the heading "Unbundled Transport," they are available only to entrance facilities ordered under § 11, "Unbundled Access." J.A. 240, 322. The ICA, however, specifically provides that headings "are not intended to be a part of or to affect the meaning" of the agreement. ICA § 2.1, J.A. 214-15.

15

Verizon's and the dissent's arguments based on the ICA drafters' intent are similarly unavailing. Verizon argues, and the dissent accepts, that the drafters of the ICA would never have suspected that 47 U.S.C. § 251(c)(2) imposed a duty, independent of § 251(c)(3), to provide entrance facilities for interconnection at TELRIC because the FCC first explicitly articulated that obligation after the ICA was drafted, in the Triennial Review Order. Thus, Verizon argues, there is no reason to think the drafters intended to write such an obligation into the ICA.

This contention fails for at least two fundamental reasons. First, like any contract, an ICA is interpreted according to its written terms. Cent. Tel. Co. of Va., 715 F.3d at 517. If a contract's language is clear, we may not choose to supplement it with evidence of the drafters' intent. See Moran, 90 U.S. at 501. As explained above, we find the language of the ICA sufficiently clear to establish that Verizon must offer entrance facilities at TELRIC for interconnection, without resort to the intent of its drafters.

Second, we find Verizon's speculation about the drafters' subjective views unpersuasive. Contrary to Verizon's and the dissent's contentions, there are indications that the drafters of the ICA regarded § 251(c)(2) as imposing an independent duty to provide entrance facilities for interconnection at cost-based

16

rates. The most obvious indication is the very existence of §

4.3. This section would have been curiously redundant if §

251(c)(3) and ICA § 11 already required that entrance facilities

be provided at cost-based rates for interconnection but §

251(c)(2) did not. Moreover, this obligation flows clearly from

the text of the Telecommunications Act itself and longstanding

FCC regulations. Section 251(c)(2) requires incumbent carriers

to provide interconnection at "any technically feasible point

within the carrier's network," and the FCC had long interpreted

"the carrier's network" to include its entrance facilities. See

Talk Am., 131 S. Ct. at 2261; Local Competition Order, 11 F.C.C.

15499, ¶ 26. Therefore, "[s]ince the enactment of the 1996 Act,

the FCC has consistently construed [47 U.S.C. 251(c)(2)] to mean

that an incumbent may be required to provide facilities to a

competitor in order to link the two carriers' networks." Brief

for the United States as Amicus Curiae Supporting Petitioners at

22, Talk Am., Inc. v. Mich. Bell Tel. Co., 131 S.Ct. 2254 (2011)

(Nos. 10-313, 10-329).

We therefore conclude that the CoreTel/Verizon ICA entitles

CoreTel to order entrance facilities for interconnection at

TELRIC.[8] Accordingly, CoreTel was entitled to summary judgment

---

[8] We are perplexed by the comfort taken by the dissent in distinguishing entrance facilities as such from interconnection
(Continued)

17

in its favor on both its and Verizon's claims for declaratory relief relating to Verizon's facilities charges. We remand to the district court for consideration of CoreTel's claim for injunctive relief and Verizon's damages claim in light of this conclusion.

B.

We next turn to CoreTel's facilities claims. After CoreTel initiated this case, CoreTel submitted 42 new bills--totaling more than $1.7 million--to Verizon for facilities charges beginning in 2009. These charges, CoreTel contends, are for trunk ports and multiplexers[9] used to handle calls delivered by Verizon to CoreTel. CoreTel concedes that Verizon provided its own means of reaching CoreTel's switch. But it contends that the ports and multiplexers that it provided on its side of the interconnection point qualify as entrance facilities and,

---

as a "service," as though the ICA did not specifically link the two by allowing CoreTel to interconnect via entrance facilities.

[9] A trunk port is a physical port in a switch. See, e.g., Access Charge Reform for Incumbent Local Exch. Carriers Subject to Rate-of-Return Regulation, 13 F.C.C. 14238, ¶ 49 (1998). A switch is "[t]he critical piece of telephone network equipment that . . . connect[s] a call from any customer's line to any other customer's line." Stuart M. Benjamin et al., Telecommunications law and Policy 952 (3d ed. 2012). Multiplexers encode multiple calls so that they may be transmitted on the same wire (and the reverse: extracting a single call from the encoded stream of multiple multiplexed calls). See, e.g., Worldcom, 17 F.C.C. 27039, ¶ 228 (2002).

18

accordingly, may be billed to Verizon under ICA §§ 1.25 and 4.3.5.[10]

We agree with Verizon that the multiplexing and trunk ports at issue are not entrance facilities under the ICA. ICA § 4.3.5 therefore provides no basis for CoreTel's facilities charges.

As it is defined in the ICA, an "entrance facility" is a facility connecting and, crucially, lying "between" the interconnecting carrier's premises and the other party's central office. ICA § 1.25, J.A. 208. But the trunk ports and multiplexers CoreTel provided lay within CoreTel's central office, not "between" CoreTel's central office and Verizon's premises. Thus, Verizon's facilities, not CoreTel's, spanned the distance between Verizon's premises and CoreTel's central office. Accordingly, the facilities CoreTel provided were not entrance facilities under ICA § 1.25.[11]

CoreTel also contends that it was entitled to bill Verizon for its use of these facilities because they were "necessary" to

---

[10] CoreTel supports its claim with documents that, it contends, reflect orders from Verizon for these facilities. As we explain below, CoreTel was not entitled to bill Verizon for these facilities regardless of whether Verizon submitted orders for them.

[11] There is no merit to CoreTel's related contention that Verizon breached the ICA by failing to order an entrance facility. The ICA does not require Verizon to order an entrance facility for interconnection but merely provides that it has the "sole right and discretion" to do so. ICA § 4.3.4, J.A. 208.

19

the use of Verizon's self-provisioned facilities. But CoreTel points to no provision of the ICA that authorizes CoreTel to simply levy facilities charges for any piece of equipment that handles Verizon's traffic. Instead, the ICA provides that CoreTel is to be compensated for the use of these facilities, on its side of the interconnection point, exclusively under the rubric of reciprocal compensation.

We therefore affirm the district court's grant of summary judgment on CoreTel's facilities claims.

C.

We next address Verizon's reciprocal compensation claims. As discussed above, when a local call is generated on one party's network and terminates on the other network, the party on whose network the call terminates may bill the originating party for reciprocal compensation. See ICA §§ 1.60, 1.60a, 5.7.1, J.A. 212, 222–23. However, the ICA exempts two categories of traffic from this scheme: "third-party traffic" and "interLATA traffic."[12] See ICA § 5.7.2(a)-(c), J.A. 223.

---

[12] "Third-party traffic" is traffic originated by a third carrier, not a party to the ICA, and merely delivered to the terminating party by way of the other party's network. See ICA § 5.2.1(a)-(b), J.A. 223. Thus, if there were a third carrier, Carrier X that also interconnected with Verizon's network, Carrier X's customers might be able to call CoreTel's customers by way of Verizon's network. Such calls would constitute third-party traffic with respect to Verizon and CoreTel. "InterLATA traffic" is traffic generated outside the local calling area,
(Continued)

20

Verizon claims that CoreTel violated these provisions by charging it reciprocal compensation for third-party and interLATA calls. CoreTel does not contest this allegation. Instead, CoreTel argues that Verizon should have to pay reciprocal compensation charges for a call when it does not provide "EMI data" for it, data CoreTel claims is needed to properly categorize every call.

However, neither the ICA nor the FCC order on which CoreTel seeks to rely, Cavalier Telephone LLC, 18 F.C.C. 25887 (2003), support this conclusion. Simply put, there is no provision of the ICA that requires Verizon to provide EMI data for every call delivered over the trunk at issue. In addition, Cavalier Telephone is not controlling. Cavalier Telephone was an arbitration order under 47 U.S.C. § 252(e)(5) relating to a separate interconnection agreement between Verizon and Cavalier Telephone. It required only that a provision be inserted into that particular ICA regarding Verizon's duty to provide EMI data to Cavalier Telephone, not that all carriers provide EMI data independent of the terms of their ICAs. See Id. ¶ 40. Adopting CoreTel's argument would frustrate the regulatory approach articulated by the FCC in its Core Commc'ns order by allowing

_____

commonly known as "long distance calls." See SBC Commc'ns Inc. v. FCC, 138 F.3d 410, 412 n.1 (D.C. Cir. 1998).

carriers to enforce § 251 duties not embodied in their own ICAs. See <u>Core Commc'ns, Inc.</u>, 18 F.C.C. 7568, ¶ 32.[13]

We therefore affirm the district court's grant of summary judgment in Verizon's favor on CoreTel's reciprocal compensation claims.

D.

We now address Verizon's claims that CoreTel improperly billed it for services under its tariffs. Verizon contends that it is entitled to recoup, under the filed-rate doctrine, amounts that it paid to CoreTel for "end-office switched access" because the description of that service in CoreTel's tariff was inaccurate.[14] The filed-rate doctrine requires that, to charge for services under a tariff, a carrier must provide its services in exactly the way the carrier describes them in that tariff. <u>Bryan v. BellSouth Commc'ns, Inc.</u>, 377 F.3d 424, 429 (4th Cir. 2004); <u>Brown v. MCI WorldCom Network Servs., Inc.</u>, 277 F.3d 1166, 1170 (9th Cir. 2002).[15]

---

[13] We conclude that CoreTel's remaining arguments relate only to damages and are foreclosed by the parties' stipulated judgment. <u>See</u> J.A. 1518–19.

[14] Neither party makes clear which switched-access rate category CoreTel applied in levying the contested charges. <u>See</u> FCC Tariff No. 3, § 3.3, J.A. 474; Va. SCC Tariff No. 3, § 3.3, J.A. 555. The parties appear to agree, however, that "end-office switching" is the relevant category. <u>See</u> Br. at 54, Op. Br. at 52-53.

[15] The parties provide no authority to establish that Virginia applies the filed-rate doctrine to its state tariffs.
  (Continued)

CoreTel's state and federal tariffs provide that CoreTel's end-office switching service will include "terminations in the end office of end user lines." FCC Tariff No. 3, § 3.3.2, J.A. 474; Va. SCC Tariff No. 3, § 3.3.1(C), J.A. 555. The FCC has held that this tariff language carries a specific and established meaning: "a physical transmission facility that provides a point-to-point connection between a customer premises and a telephone company office." AT&T Corp. v. YMax Comm. Corp. ["YMax"], 26 F.C.C. 5742, ¶ 40 (2011). To provide "terminations in the end office of end user lines," a carrier must "provide . . . physical transmission facilities that establish point-to-point connections between the premises of Called/Calling Parties and [the carrier's] equipment." YMax, 26 F.C.C. 5742, ¶ 37, 41.

The undisputed evidence establishes that CoreTel does not provide the physical infrastructure over which calls are delivered from CoreTel's premises to its customers. Instead, as in YMax, CoreTel converts incoming calls into a data stream once they reach its office and then delivers these calls to its customers over the public internet. See YMax, 26 F.C.C. 5742, ¶ 41; J.A. 390(K), (Q)-(R), (T)-(W). This evidence makes clear

_____

CoreTel, however, does not contend otherwise. We therefore conclude that CoreTel has waived this argument and proceed with our analysis assuming, without deciding, that Virginia does indeed follow the filed-rate doctrine.

that CoreTel has not deployed its own physical facilities to connect it to its customers and, accordingly, does not provide "terminations in the end office of end user lines" as required by its tariffs.

It is no mere technicality that the language of CoreTel's tariff requires that CoreTel itself provide the facilities. End-office switching charges are among the highest recurring charges in any carrier's tariff, a price that is ordinarily justified by the need "to allow local exchange carriers to recover the substantial investment required to construct the tangible connections between themselves and their customers throughout their service territory." YMax, 26 F.C.C., 5742, ¶ 40. A carrier that finds a way to deliver incoming calls to its customers without building physical connections to each of them has far less infrastructure investment to recoup.

CoreTel argues in the alternative that its tariffs, unlike those in YMax, explicitly permit it to charge for "switched-access service" provided using IP technology. See FCC Tariff No. 3, § 1, J.A. 433. But this language only appears in CoreTel's general definition of switched-access service. Id. The language interpreted in Ymax, discussed above, appears in CoreTel's more specific definition of the particular type of switched access service at issue, end-office switched access. Id. at § 3.3.2, J.A. 474. The specific governs the general.

24

See <u>RadLAX Gateway Hotel, LLC v. Amalgamated Bank</u>, 132 S. Ct. 2065, 2071 (2012).  The language of CoreTel's end-office switching service does not permit that specific tariff rate to be applied when CoreTel delivers calls to customers over the public Internet rather than using a physical facility owed by CoreTel.[16]

We therefore affirm the district court's grant of summary judgment in Verizon's favor on Verizon's switched-access claims.

IV.

For the reasons above, the judgment of the district court is

<u>AFFIRMED IN PART, REVERSED IN PART,<br>AND REMANDED WITH INSTRUCTIONS.</u>

---

[16] Contrary to CoreTel's contention, a subsequent FCC regulation that incorporates this sort of IP-based termination into a definition of "switched exchange access services" does not alter our interpretation of CoreTel's tariff.  <u>See</u> 47 C.F.R. § 61.26(a)(3)(ii) (2012).  This regulation merely defines the term for the purposes of determining what tariffs will be subject to regulation as switched-access tariffs.  It does not mandate a definition of "switched access" as the term is used in a switched-access tariffs, much less one that vitiates the descriptions of narrower switched-access rate categories.

25

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

This is a straightforward contract dispute between two telecommunications companies, CoreTel and Verizon, over the fees each agreed to pay the other in interconnecting their networks. When Verizon pressed CoreTel to pay over $880,000 in past-due amounts for "entrance facilities" that CoreTel leased from Verizon, CoreTel commenced this action.

While each party has disputed various amounts payable to the other, the principal dispute, on which I disagree with the majority, is whether CoreTel agreed to pay Verizon a <u>tariff</u> rate or a lower <u>cost-based</u> rate for lease of Verizon's entrance facilities for the purpose of interconnection. Reading the contract as a whole and in context, I conclude that it clearly required CoreTel to pay tariff rates, as the district court also concluded.

I respectfully submit that the majority has rewritten this private agreement to bring it in line with what CoreTel might have been able to obtain through negotiations when it signed the contract, based on changing interpretations of the Telecommunications Act of 1996, which regulates such agreements. That is, it focuses on what CoreTel <u>could have demanded</u> under the law, not on what CoreTel actually <u>agreed to accept</u> when it executed the written contract. No one contends that the written

26

contract was or is unenforceable or not in compliance with the Telecommunications Act. Indeed, the Telecommunications Act itself allows the parties to negotiate the rates and fees to be paid for connecting networks. See 47 U.S.C. § 252.

Thus, I would enforce the contract according to its terms and affirm the judgment of the district court.

I.

Verizon (referring collectively to Verizon Virginia LLC and Verizon South Inc.) is an incumbent local exchange carrier ("incumbent LEC") that has been providing telephone exchange services throughout Virginia since before the enactment of the Telecommunications Act of 1996. In enacting that Act, Congress sought to introduce competition in the telecommunications market by lowering the barriers to entry for would-be competitors. To this end, the Act requires incumbent LECs to share their networks with any competitive local exchange carrier ("competitive LEC") and allow the competitive LEC (1) to lease from the incumbent LEC unbundled network elements (i.e., "a la carte" network elements enabling the competitive LEC "to create its own network without having to build every element from scratch," Talk Am., Inc. v. Mich. Bell Tel. Co., 131 S. Ct. 2254, 2258 (2011)) and (2) to interconnect with the incumbent LEC's network.

27

These obligations are codified in two statutory provisions. Section 251(c)(3) of the 1996 Act requires incumbent LECs to provide competitive LECs with "nondiscriminatory access to network elements on an unbundled basis." 47 U.S.C. § 251(c)(3) (emphasis added). And, in a similar vein, § 251(c)(2) requires an incumbent LEC "to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network . . . for the transmission and routing of telephone exchange service and exchange access." Id. § 251(c)(2) (emphasis added). For such unbundled network elements and interconnection, the incumbent LEC may only charge "rates, terms, and conditions that are just, reasonable, and nondiscriminatory." Id. §§ 251(c)(2)(D), 251(c)(3). But the Telecommunications Act makes clear that those rates, terms, and conditions are subject to negotiation by the parties. See id. § 252(a).

CoreTel Virginia, LLC, is a competitive LEC that, like Verizon, serves customers in Virginia. When it requested unbundled network elements and interconnection from Verizon, the parties entered into an agreement on November 16, 2004 ("2004 Adoption Agreement"), which adopted the terms and conditions of an earlier, 2002 arbitrated interconnection agreement between Verizon and Cox Virginia Telcom, Inc. ("2002 Interconnection Agreement"). The 2004 Adoption Agreement incorporated all the

28

terms and conditions of the 2002 Interconnection Agreement with several modifications, including a modification that the 2004 Adoption Agreement "[did] not include adoption of any provision [in the 2002 Interconnection Agreement] imposing an unbundling obligation on Verizon" because, as the 2004 Adoption Agreement explained, that obligation no longer applied to Verizon as a result of a 2003 FCC order, In re Review of Section 251 Unbundling Obligations of Incumbent Local Exch. Carriers ("2003 Triennial Order"), 18 FCC Rcd. 16978 (2003), and subsequent related decisions.

With respect to the "entrance facilities" that are at issue in this case, the 2002 Interconnection Agreement authorized CoreTel to interconnect through, among other options, "an Entrance Facility . . . leased from Verizon . . . in accordance with . . . terms and conditions, including without limitation, rates and charges set forth [1] in this Agreement, [2] in any applicable Tariff(s), or [3] as may be subsequently agreed to between the Parties." 2002 Interconnection Agreement, §§ 4.3.1, 4.3.3. The "rates and charges set forth in this Agreement" were those described in Exhibit A, entitled "Detailed Schedule of Itemized Charges." Exhibit A included a category of rates called "Unbundled Transport," under which it specified rates for "Entrance Facilities," as are at issue here. And the terms for unbundled transport were set forth in § 11 of the Agreement.

29

The parties agree that Exhibit A's rates and charges were cost-based. Under the terms of the 2004 Adoption Agreement, however, Verizon's unbundling obligations were eliminated, leading Verizon to bill CoreTel for entrance facilities not as unbundled elements under the cost-based rate in Exhibit A, but as entrance facilities under Verizon's tariff rates.

Although Verizon thus billed CoreTel each month over the course of some eight years for entrance facilities at tariff rates, CoreTel maintained that it should only have been charged cost-based rates and refused even to pay those rates, making only a single payment of $591.95 in February 2006. By the time of this litigation, it had run up a bill of over $880,000, based on Verizon's billings at tariff rates.

When Verizon sent CoreTel notice of default and threatened to terminate service, CoreTel commenced this action. While the parties have fought over various amounts owed, the main issue presented to us on appeal is whether the 2002 Interconnection Agreement, as modified by the 2004 Adoption Agreement, entitled CoreTel to pay only cost-based rates for entrance facilities for the purpose of interconnection instead of the tariff rates that Verizon billed.

The district court concluded that the 2002 Interconnection Agreement did not give CoreTel a right to lease entrance facilities for interconnection at cost-based rates, even though

30

CoreTel could have insisted on such rates when the 2004 Adoption Agreement was executed. Despite this legal right, the district court noted that CoreTel was bound by the terms of the contract to which it actually agreed. The court thus entered judgment in favor of Verizon.

II.

Based on the contract as written, I agree with the district court and conclude that CoreTel was required to pay tariff rates for entrance facilities, as Verizon billed it.

The structure of the obligations between the parties is readily apparent from the agreement taken as a whole. Section 4.3.1 of the 2002 Interconnection Agreement authorized CoreTel to specify any of three different methods by which to connect with Verizon's network, including through "an Entrance Facility." And § 4.3.3 provided that the rates and charges for such facilities were as (1) "set forth in this Agreement," (2) "set forth . . . in any applicable Tariff(s)," or (3) "as may be subsequently agreed to between the Parties." But critically, § 4.3.3 did not directly refer to any rates. In fact, the only rates for entrance facilities actually "set forth in the Agreement," were referenced in § 11, which governed only unbundled access. Section 11 addressed "interoffice transmission facilities" and provided that "Verizon shall

31

provide [CoreTel] with dedicated local transport, common local transport in conjunction with unbundled local switching, unbundled interoffice transmission facilities, and other services in accordance with Exhibit A." 2002 Interconnection Agreement, § 11.6 (emphasis added). And part II of Exhibit A listed cost-based rates for unbundled elements, including a cost-based rate for "Entrance Facilities." Id. Exhibit A, part II.C. No other part of Exhibit A mentioned entrance facilities; they were listed only under "Unbundled Transport."

In short, the 2002 Interconnection Agreement provided that entrance facilities were to be billed either at tariff rates or, if leased as unbundled elements, at cost-based rates as set forth in Exhibit A. Those rates were the only "rates and charges" "set forth" in the 2002 Interconnection Agreement. Thus, under the 2002 Agreement, if charges for entrance facilities were not payable in accordance with Exhibit A, they were only payable at tariff rates.

The 2002 Interconnection Agreement's provisions allowing for purchase of unbundled network elements at cost-based rates were, at the time (in 2002), necessitated by 47 U.S.C. § 251(c)(3), which required Verizon, as an incumbent LEC, to provide any requesting competitive LEC, such as CoreTel, unbundled network elements at a reasonable, nondiscriminatory rate. And that rate was established by the FCC, in interpreting

32

§ 251(c)(3), to be its cost-based TELRIC rate (standing for Total Element Long-Run Incremental Costs) -- a rate "based on the hypothetical construction and operation of the most efficient local network conceivable." GTE South, Inc. v. Morrison, 199 F.3d 733, 747 (4th Cir. 1999).

After the 2002 Interconnection Agreement was executed, however, the law regarding § 251(c)(3)'s unbundling requirements changed. The FCC, in its 2003 Triennial Order, interpreted § 251(c)(3) not to require incumbents to provide competitive LECs with entrance facilities as unbundled network elements at cost-based rates. Instead, the FCC concluded that entrance facilities must be provided at cost-based rates only for the limited purpose of interconnection:

> We conclude that our previous definition [of § 251(c)(3)] was overly broad. As we explain in this Part, competitive LECs often use transmission links including unbundled transport connecting incumbent LEC switches or wire centers in order to carry traffic to and from its end users. . . . Unlike the facilities that incumbent LECs explicitly must make available for section 251(c)(2) interconnection, we find that the Act does not require incumbent LECs to unbundle transmission facilities connecting incumbent LEC networks to competitive LEC networks for the purpose of backhauling traffic.
>
> In reaching this determination we note that, to the extent that requesting carriers need facilities in order to interconnect with the [incumbent LEC's] network, section 251(c)(2) of the Act expressly provides for this and we do not alter the Commission's interpretation of this obligation.

2003 Triennial Order, 18 FCC Rcd. ¶ 365, at 17203-04 (alterations in original) (emphasis added) (footnotes omitted) (internal quotation marks omitted). The Supreme Court has since embraced that Order, stating that entrance facilities must be leased at cost-based rates for the purpose of interconnection only. See Talk America, 131 S. Ct. at 2258-60.

The parties were aware of these developments when they contracted in 2004. Accordingly, they included a provision eliminating any unbundling obligation in their 2004 Adoption Agreement:

> For avoidance of doubt, adoption of the Terms does not include adoption of any provision imposing an unbundling obligation on Verizon that no longer applies to Verizon under the [2003 Triennial Order and related case law].

2004 Adoption Agreement, § 1.B. It is incontrovertible that, by reason of that language, CoreTel was not entitled to lease entrance facilities as unbundled network elements pursuant to § 251(c)(3). Indeed, CoreTel notes in its briefing that it "never ordered [an unbundled network element], period." And with the elimination of the unbundling obligation, the rates for unbundled elements were rendered inapplicable, including the rate for "Entrance Facilities."

But CoreTel contends that the 2002 Interconnection Agreement nonetheless required that Verizon provide entrance facilities under § 251(c)(2) at the cost-based rates in Exhibit

34

A. It argues, and the majority accepts, that § 4.3.3 of the 2002 Interconnection Agreement explicitly provided for "interconnection" at the rates "set forth in this Agreement" and that those rates were the cost-based rates provided in Exhibit A, even though the rates in Exhibit A were specifically for unbundled elements. Under CoreTel's view, § 4.3.3 did not specify whether Verizon had to provide interconnection via leases of entrance facilities as unbundled elements under § 251(c)(3) (its right to which was abrogated under the 2004 Adoption Agreement) or for purposes of interconnection only, as under § 251(c)(2). Thus, it argues, its rights to purchase entrance facilities for interconnection were not affected by the 2004 Adoption Agreement, which only eliminated Verizon's unbundling obligation under § 251(c)(3).

This argument, however, ignores both the explicit language of the 2002 Interconnection Agreement and the 2004 Adoption Agreement, as well as the underlying litigation that led to the 2002 Agreement. As pointed out above, the only rates expressly provided for entrance facilities in the 2002 Interconnection Agreement were rates for unbundled facilities. And when Verizon's unbundling obligation was eliminated, so too were the corresponding rates for unbundled elements. Thus, the only other rates available for entrance facilities were tariff rates.

35

Just as indicative of this point is the history of the litigation leading to the 2002 Interconnection Agreement. That Agreement, as well as similar agreements involving Verizon, was created as a result of an FCC arbitration order. In re Worldcom, Inc., 17 FCC Rcd. 27039 (2002). And paragraphs 210 through 217 of that order described the dispute between Verizon and Cox (as well as other competitive LECs) as to "Interconnection Transport," with the competitive LECs asserting that such interconnection had to be provided at unbundled network rates, and Verizon arguing that Cox and the other competitive LECs had to "purchase 'entrance facilities and transport for interconnection' from its access tariffs." Id. ¶ 210, at 27142 (emphasis added). These paragraphs of the FCC order described the provision of interconnection exclusively in the context of the purchase of unbundled elements pursuant to § 251(c)(3). See id. ¶ 215 & n.716, at 27144. Nowhere in this discussion was there any reference to Cox or the other competitive LECs having the right to purchase entrance facilities for the limited purpose of interconnection pursuant to § 251(c)(2). Entrance facilities were instead only discussed in the order as unbundled network elements. See id. ¶¶ 210-217, at 27142-46.

The FCC's reasoning, which is based exclusively on § 251(c)(3), is clearly what gave rise to § 4.3.1 of the 2002

36

Interconnection Agreement. The FCC order defined the proper rates at which Cox and other involved competitive LECs could "order '[e]ntrance [f]acilities and transport for [i]nterconnection.'" Id. ¶ 217, at 27145. This language is nearly identical to § 4.3.1 of the 2002 Interconnection Agreement, which allowed Cox to specify "an entrance facility and transport" as its interconnection method. Based on this, it is clear that § 4.3.3 of the 2002 Interconnection Agreement provided for the purchase of entrance facilities as unbundled network elements, and the obligation to provide unbundled network elements at cost-based rates was eventually removed from the contract through the 2004 Adoption Agreement.

This interpretation is also supported by Exhibit A itself. All of the cost-based rates in Exhibit A for "entrance facilities" were listed under the heading "Unbundled Transport." Yet CoreTel now wants to apply those rates to the purchase of entrance facilities that it explicitly claims were not unbundled. It fails to recognize that Exhibit A's rates for unbundled elements were removed from the Agreement through the 2004 Adoption Agreement, and they were never applicable to entrance facilities except as an unbundled element. And absent any Exhibit A rate for entrance facilities, the only rates given by the 2002 Interconnection Agreement for entrance facilities were tariff rates. See 2002 Interconnection Agreement, § 4.3.3.

37

There is a reason why the 2002 Interconnection Agreement did not contain special rates for entrance facilities provided solely for interconnection. Before the FCC's 2003 Triennial Order, the general understanding was that incumbent LECs had no obligation under § 251(c)(2) to provide entrance facilities at cost-based rates. That section was limited to "interconnection" -- a service, not a facility. Entrance facilities were always provided as unbundled network elements under § 251(c)(3). This was rational, as it allowed the competitive LECs the greatest flexibility in using the entrance facilities. This pre-2003 understanding of the law was explicitly affirmed by the FCC in its amicus brief in Talk America, to which the Supreme Court deferred as an agency interpretation. That brief stated:

> The FCC's interconnection rules, which were adopted in 1996, do not expressly require incumbents to provide entrance facilities to satisfy their interconnection obligations under Section 251(c)(2). That is because, until 2003 -- when the FCC eliminated unbundled access to entrance facilities in the Triennial Review Order -- a competitive LEC typically would elect to order a cost-priced entrance facility under Section 251(c)(3) since an unbundled network element can be used more expansively than the same facility provided solely for interconnection under Section 251(c)(2). Only after the FCC eliminated access to entrance facilities as unbundled network elements did it have occasion to clarify, in the Triennial Review Order and the Triennial Review Remand Order, that Section 251(c)(2) gives competitive LECs a right of access to such facilities for interconnection at cost-based rates.

Brief for the United States as Amicus Curiae Supporting Petitioners, at 22 n.6, Talk America, 131 S. Ct. 2254 (Nos. 10-313, 10-329) (emphasis added) (citations omitted).

Thus, because § 251(c)(2) was never understood in 2002 to require the provision of entrance facilities, only "interconnection" as a service, the majority has no support for reading the 2002 Interconnection Agreement now to include such an obligation on Verizon. Instead, the drafting parties uniformly treated entrance facilities in the only way known at the time -- as unbundled elements to be provided under § 251(c)(3). And they included provisions in § 11.6 and Exhibit A allowing for the leasing of entrance facilities as such.

CoreTel points to § 27.1 of the 2002 Interconnection Agreement to suggest that Verizon's obligations changed with the 2003 Triennial Order. That paragraph provided:

> Each Party shall remain in compliance with [a]pplicable . . . federal, state, and local laws, rules and regulations in the course of performing this Agreement. Each Party shall promptly notify the other Party in writing of any governmental action that suspends, cancels, withdraws, limits, or otherwise materially affects its ability to perform its obligations hereunder.

But CoreTel can point to no change in the law that "materially affect[ed]" either party's "ability" to perform its obligations under the Agreement. The Telecommunications Act always provided that the rates to be paid to an incumbent LEC were subject to

39

negotiation, even as the Act requires that any rates be reasonable and nondiscriminatory. See 47 U.S.C. § 252(a), (d). Moreover, CoreTel's reading of § 27.1 cannot be squared with other provisions of the 2002 Interconnection Agreement. For example, § 27.3 -- which required the parties to negotiate in good faith to incorporate changes in the law -- would be rendered superfluous under CoreTel's reading of § 27.1.

Finally, CoreTel argues that even if the 2002 Interconnection Agreement did not explicitly allow for its leasing of entrance facilities at the cost-based rates listed in Exhibit A, the 2004 Adoption Agreement effectively incorporated the FCC's 2003 Triennial Order into the contract to allow it to do so. This claim, however, finds no support in the language of the 2004 Adoption Agreement. That Agreement stated that it "does not include adoption of the provisions imposing an unbundling obligation that no longer applies" after the 2003 Triennial Order. This is a limitation on the terms of the contract, not an addition to it. If no § 251(c)(2) cost-based pricing duty can be found in the 2002 Interconnection Agreement, the 2004 Adoption Agreement does not add one. Indeed, it adds nothing at all. Rather, it strikes out the unbundling requirements in § 11 of the 2002 Interconnection Agreement because those provisions related to obligations that "no longer

40

appl[ied]" following the 2003 Triennial Order, just as the 2004 Adoption Agreement explicitly stated.

If CoreTel had wanted to change the terms of the 2002 Interconnection Agreement as modified by the 2004 Adoption Agreement, it could have done so at any point under § 27.3. Indeed, it could have sought an entirely new Agreement with Verizon in 2004 rather than agreeing to adopt one that was drafted prior to the 2003 Triennial Order. But CoreTel did none of these things, and thus it is bound by the language of the 2002 Interconnection Agreement as modified by the 2004 Adoption Agreement. See In re Core Commc'ns, Inc., 18 FCC Rcd. 7568, 7582 § 32 (2003) (holding that a party to an Interconnection Agreement "cannot rely upon the general section 251 duties to circumvent the terms of its agreement").

In sum, based on the language of the 2002 Interconnection Agreement and the 2004 Adoption Agreement, as well as the context of those Agreements, I cannot conclude that CoreTel is now entitled to pay only cost-based rates for its lease of entrance facilities for interconnection. Rather, as the Agreements provide, it is required to pay for those entrance facilities at tariff rates, the only other rate provided for in the Agreements.

I would accordingly affirm the judgment of the district court in all respects.

41